FILED

09/08/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 16, 2017 Session

**IN RE GRACE N.**

**Appeal from the Juvenile Court for Davidson County**
**No. PT-120820, 2010-184  Sheila Calloway, Judge**

_____

**No. M2016-00453-COA-R3-JV**

_____

This appeal stems from a juvenile court proceeding in Davidson County.  Mother challenges the entered parenting schedule and raises a number of issues pertaining to the trial court's child support calculations.  For the reasons expressed herein, we affirm in part, reverse in part, vacate in part and remand for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part, Vacated in Part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

D. Scott Parsley, Nashville, Tennessee and John J. Hollins, Jr., Franklin, Tennessee, for the appellant, Rachel N.

Jeffrey Spark, Nashville, Tennessee, for the appellee, Julian G.

**OPINION**

**Background and Procedural History**

This is the second appeal in this matter between Rachel N. ("Mother") and Julian G. ("Father").[1]  As the pertinent background facts are detailed in *In re Grace N.*, No. M2014-00803-COA-R3-JV, 2015 WL 2358630 (Tenn. Ct. App. May 14, 2015), we restate them only briefly here.  Mother and Father met online while Father was working in France.  *In re Grace N.*, 2015 WL 2358630, at *1.  The two lived together for a short

---

[1] In cases involving a minor child, it is this Court's policy to redact the names of the parties sufficient to protect the child's identity.

period when Father returned to the United States, and in January 2010, the parties' child, Grace N., was born. *Id.* Father soon filed a petition to establish parentage on January 13, 2010, and Mother filed a counter-petition to set child support and parenting time. *Id.*

Following a multi-day hearing, the trial court found that Father did not dispute that Mother should be designated the primary residential parent. *Id.* at *2. The trial court determined that Mother was the "evident and obvious choice" for such a designation, and the trial court further determined that Mother should have sole decision-making authority. *Id.* In addition to adopting a parenting schedule that purported to give Father 85 days of parenting time, the trial court set Father's child support at $1,218.00 per month and calculated retroactive support beginning in 2010. *Id.*

Father then appealed to this Court raising several issues. Among other things, Father contended that the trial court had not awarded him enough parenting time, that the trial court had erred in setting current child support and child support arrears, and that the trial court had erred in ordering Mother to provide health insurance for the child. *Id.* In addressing these and the other raised issues, we affirmed the trial court's judgment in part and reversed it in part. Concerning Father's grievance with respect to his parenting time, we noted that the parenting plan adopted by the trial court was not sufficient:

> The parenting plan adopted by the trial court differs from a "standard" parenting plan in that it does not provide for overnight parenting time during the week; most of the holiday parenting time is for less than twenty-four hours; there is no provision for a fall break; and the Christmas vacation parenting time is limited to less than twenty-four hours on Christmas Eve and Christmas Day. With the restrictions on Father's parenting time, it cannot be said that he is able to enjoy the "maximum participation possible" in his child's life. While the trial court's decision may contain reasons for rejecting Father's proposed week-on/week-off schedule, there is no justification in the record for the minimal amount of parenting time awarded to Father in the parenting plan adopted by the trial court.

*Id.* at *5. In connection with this conclusion, we observed that although the Child Support Guidelines ("Guidelines") presume that a child will reside with the alternate residential parent at least 80 days a year, the trial court had awarded Father only "approximately" 68 days of parenting time when measured against the Guidelines. *Id.* We accordingly remanded the matter with instructions "to increase Father's parenting time to *at least* the minimum 80 days presumed by the Guidelines." *Id.*

Concerning the trial court's child support calculations, we reviewed several discrete sub-issues. First, we considered Father's argument that Mother had been underemployed in 2013:

> The trial court based current child support on a gross monthly income for Mother of $2,165.00, as reflected on her 2013 federal income tax return. Father argues that Mother worked only part time in 2013 and "spent much of her time acting as a contractor on her and her husband's new home."
>
> . . . .
>
> Mother acknowledges in her brief that Father argued at trial, as he does on appeal, that Mother was voluntarily underemployed. Yet, in its decision, the trial court states: "There was no dispute as to the accuracy of Mother's income." Thus, it appears that the court failed to consider Father's argument with respect to underemployment.

*Id.* at *6. Because we held that child support would have to be recalculated when the trial court increased Father's parenting time, we noted that the trial court would have another opportunity to consider the issue of underemployment at that time. *Id.*

Our review of the trial court's child support calculations also involved an inquiry into Mother's "work-related childcare costs." *See* Tenn. Comp. R. & Regs. 1240-02-04-.02(29)(a) (defining such costs as the "expenses for the care of the child for whom support is being determined which are due to employment of either parent or non-parent caretaker"). We noted that the trial court had determined that it was appropriate to consider the childcare expenses included on Mother's tax returns for purposes of calculating retroactive child support. *In re Grace N.*, 2015 WL 2358630, at *6. Whereas Father had argued that these expenses were not appropriate, we observed that the trial court's written decision contained only a general conclusion and did not specifically address their propriety. *Id.* at *7. We further noted that several comments by the trial judge indicated that the trial court's personal views may have skewed the decision regarding the reasonableness of such expenses. *Id.* Because we held that these considerations manifested an abuse of discretion, we remanded for a new hearing on work-related childcare expenses. *Id.*

We also considered Father's argument that the trial court had improperly attributed certain income to him. In particular, we reviewed the trial court's decision to attribute income to Father from bartering with his attorney. Although there was no dispute that Father had performed home maintenance services for his attorney in exchange for legal services, the trial court had attributed the entirety of Father's

attorney's fees as income despite the fact that the proof indicated that Father had not performed sufficient in-kind services to cover the entire bill. *Id.* at \*10. Because the trial court had failed to properly place a value on Father's services, we remanded the issue of Father's income for reconsideration. *Id.*

We also remanded the issue of Father's income for reconsideration based on the trial court's erroneous presumption that Father owned 50% of a rental property located at 600 Fatherland Street (the "Fatherland Property"). Whereas the Tennessee Code provides a presumption that "at least one-half of all real . . . property that is titled to or in the possession of the obligor is owned by the obligor," *see* Tenn. Code Ann. § 36-5-903, we noted that a presumption of one-half ownership had been overcome as the Fatherland Property deed reflected that the property was jointly owned by Father and two other individuals. *In re Grace N.*, 2015 WL 2358630, at \*10.

In addition to the foregoing concerns, we addressed several other issues in the first appeal, including Father's argument that he, not Mother, should be able to provide the child's health insurance. We rejected Father's assertion of error on the insurance issue and affirmed the trial court's decision to order Mother to provide health insurance for the child. *Id.* at \*11. Remand proceedings subsequently ensued in the trial court.

On January 4, 2016, the trial court entered an order in an effort to comply with our remand instructions regarding Father's parenting time with the child. Therein, the trial court concluded that the child's best interest would be served by allowing Father to exercise 120 days of parenting time a year. The trial court reached this conclusion in light of the various factors outlined in Tennessee Code Annotated section 36-6-106(a). As a general matter, Father was given parenting time with the child from "Thursday after school to Monday at school," "every other week." Father was also provided parenting time with the child on Wednesday afternoons every week. Although the parties' day-to-day schedule originally applied to the child's summer vacation period, save for giving Father two weeks in June and two weeks in July, the trial court later entered an order that also gave Mother four weeks of uninterrupted summer parenting time. Notably, the adopted parenting plan did not disturb Mother's previous designation as the primary residential parent, and it specifically provided that she retained decision-making authority with respect to the child's educational decisions, non-emergency health care, religious upbringing, and extracurricular activities. Although the January 4 order did not address the various child support issues that we had remanded, it stated that such issues would be addressed after a separate evidentiary hearing was held.

In an order entered on August 8, 2016, the trial court addressed the outstanding issues pertaining to child support. In outlining the scope of its review, the trial court began its August 8 order by noting as follows:

- 4 -

[T]his Court conducted a new hearing on work-related child care expenses, hearing testimony and receiving evidence on the reasonableness of Mother's work related child care expenses incurred since the Child's birth. This Court also conducted a re-hearing on the issue of Mother's underemployment, hearing testimony and receiving evidence on whether Mother has been voluntarily underemployed since the child's birth. This Court also considered evidence regarding the parties' current income including the value of any income that Father realized from his ownership interest in the Fatherland Street property, its sale, and the value of any barter for attorney's fees by Father with his current counsel.

With respect to the issue of Mother's underemployment, the trial court held that the evidence supported a finding that Mother was voluntarily underemployed. Specifically, it determined that she had the capacity to earn at least $70,000.00 per year for 2010 and $80,000.00 or more per year as of January 2012 and thereafter. The trial court observed that such earnings were less than Mother had earned before the child's birth.

Concerning the issue of Mother's work-related childcare expenses, the trial court held that "Father should not have to underwrite Mother's use of child care for anything other than employment." It also opined that "the amount Mother spent on childcare was not reasonable given the parties' joint income or their lifestyle." Upon making these statements, the trial court reduced Mother's childcare costs to $550.00 per month. It further held that no work-related childcare expenses should be considered past August 2015, the date that the child entered kindergarten.

On the issue of the Fatherland Property, the trial court imputed income of $2,700.00 to Father in 2014. In reaching this decision, the trial court found that Father did not participate in the day-to-day management of the property. It further determined that none of the rental income had passed through his hands. According to the trial court, the evidence supported the finding that Father simply received $2,700.00 when the Fatherland Property was sold.

Concerning the issue of Father's barter income, the trial court observed that Father and his attorney had agreed that $2,925.00 was a fair value for Father's home maintenance services. The trial court agreed that this amount was reasonable, and it imputed the amount as income to Father in 2014 for purposes of calculating child support.

After making the foregoing findings and conclusions, the trial court calculated child support and based its calculations, in part, on the income Father had represented in

his tax returns from 2010-2015. As a part of its support calculations, the trial court rejected Mother's request to impute $837.84 in annual income to Father for the cell phone fringe benefit he received from his employer. The trial court also held that Father, not Mother, would provide health insurance for the child. Moreover, all non-insured out-of-pocket medical expenses were ordered to be shared as follows: Mother (63%) and Father (37%). This appeal followed.

## Issues Presented

On appeal, Mother raises several issues for our review. She generally questions the scope of the trial court's actions on remand and raises the following concerns, which we have reworded for clarity:

1. Whether the trial court erred when it made new designations of primary residential parent and major decision maker, conducted a best interest analysis that contradicts that of the original trial judge, and entered a parenting schedule that is not in the child's best interest.

2. Whether the trial court erred in its determination of Father's income with respect to the Fatherland Property.

3. Whether the trial court erred in its determination of Father's barter income.

4. Whether the trial court erred when it excluded certain income amounts that had been attributed to Father prior to the first appeal and which had been based on Father's sworn representations of income.

5. Whether the trial court erred when it excluded the musician profit income claimed by Father in 2015.

6. Whether the trial court erred when it excluded Father's cell phone fringe benefit from his income.

7. Whether the trial court erred in determining that Mother has been voluntarily underemployed since July 2010 and in imputing income to her based on the trial court's independent research.

8. Whether the trial court erred in determining that Mother's work-related childcare costs should be reduced from July 2010 through July 2015 and

- 6 -

eliminated altogether for the first six months of 2010 and from August 2015 and thereafter.

9. Whether the trial court erred in allowing Father to provide health insurance for the child and in modifying the equal sharing of out-of-pocket uncovered medical expenses.

In addition to the foregoing concerns, Mother asks for attorney's fees incurred on appeal. We note that Father's brief also contains a request for appellate attorney's fees.

## Standard of Review

We review a trial court's findings of fact de novo upon the record, accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Northland Ins. Co. v. State Farm Mut. Auto Ins. Co.*, 916 S.W.2d 924, 926 (Tenn. Ct. App. 1995). No such deference is given to a trial court's legal conclusions, which are afforded no presumption of correctness on appeal. *Davis v. Davis*, 223 S.W.3d 233, 238 (Tenn. Ct. App. 2006) (citations omitted). With respect to a trial court's discretionary decisions, we employ an abuse of discretion standard. "The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." *Lee Med., Inc. v Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted). We do not second-guess a trial court under this standard, as it "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives." *Id.* (citations omitted). With that said, the abuse of discretion standard does not immunize a trial court's decision from appellate review. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002) (citation omitted). Although it prevents us from substituting our discretion in the place of the trial court's discretion, the abuse of discretion standard "does not prevent us from examining the trial court's decision to determine whether it has taken the applicable law and the relevant facts into account." *Id.* (citations omitted). A trial court abuses its discretion when "it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc.*, 312 S.W.3d at 524 (citations omitted).

## Discussion

### *Parenting Issues*

We first address Mother's issues with respect to the custodial arrangement and parenting schedule implemented under the trial court's January 4, 2016 order. In addition

to arguing that the trial court erred in making new designations of primary residential parent and major decision maker, Mother suggests that the entered parenting schedule is not in the child's best interest. For the reasons set out below, we find no reason to disturb the parenting arrangement ordered by the trial court.

As an initial matter, we address Mother's stated concern that new designations of primary residential parent and major decision maker were made on remand. We agree with Mother that such issues were beyond the scope of the permissible decisions to be made on remand. Indeed, outside of remanding the case for the trial court to address several child support issues, we remanded the case with instructions "to increase Father's parenting time to *at least* the minimum 80 days presumed by the Guidelines." *In re Grace N.,* 2015 WL 2358630, at *5. We did not contemplate that Mother's status as primary residential parent should be revisited, nor did we contemplate that the trial court should inquire into the allocation of specific decision-making responsibilities. In the first appeal, we observed that Father had not disputed Mother's designation as primary residential parent. *Id.* at *2. Moreover, although Father had appealed the trial court's allocation of sole decision-making authority to Mother with respect to the child's educational, non-emergency medical, and extracurricular activities, we found "no error in the trial court's decision to make Mother the sole decision-maker." *Id.* at *12.

As it is, however, we do not interpret the trial court's actions on remand as addressing these matters anew as if they had not already been conclusively determined. Although the January 4 order and its attached parenting plan do address the designation of the primary residential parent and decision-making authority, they do not disturb the previously-established rulings on these issues in any way. In our view, the trial court was merely attempting to restate and confirm what had been conclusively determined prior to remand incident to its fashioning of the parenting schedule.

This understanding aside, it is unclear to us what Mother's specific grievance is with respect to this matter. Even if we assumed that the trial court had truly addressed these issues independently and was not merely restating the holdings already determined prior to remand, the outcome is the same. Mother is still the primary residential parent, and Mother still has authority over all major decisions. Therefore, to the extent Mother is specifically complaining about the trial court's designation of the primary residential parent and its allocation of decision-making authority, she advances her argument to an uncertain end.

Having considered the oral argument of her counsel on appeal, however, it is apparent that Mother actually takes umbrage at the fact that the trial court labeled her and Father "joint custodians," a designation that had not been made prior to the first appeal. Mother's counsel argued that this designation was inconsistent with the trial court's

allocation of all major decision-making authority to Mother. At the outset, we note that Mother did not properly present an objection to the designation of the parents as "joint custodians" in her brief's statement of the issues. Although the brief asserts error on the trial court's "new designations of primary residential parent and major decision maker," it does not challenge the specific denomination of the parties as "joint custodians." Inasmuch as this issue is not raised as an issue in her brief, we deem it to be waived. *See, e.g.*, *Champion v. CLC of Dyersburg, LLC*, 359 S.W.3d 161, 163 (Tenn. Ct. App. 2011) ("An issue not raised in an appellant's statement of the issues may be considered waived.").[2]

Having dealt with the foregoing issues surrounding the custody arrangement, we now turn to Mother's specific concerns about the implemented parenting schedule. Mother's overarching premise is that the parenting schedule ordered by the trial court is not in the child's best interest. Her appellate brief advances a number of arguments in support of this contention, and we note that much of her concern is leveled at the scope of the trial court's actions on remand.

With respect to Mother's concern about the scope of the remand proceedings, we begin by addressing some specifics of the case's history that we have not previously mentioned. Prior to the first appeal, the case was presided over by the Honorable Sophia Crawford. Following a judicial election, however, the Honorable Sheila Calloway presided over the remand proceedings. When Judge Calloway ruled on the parenting time issues, she specifically stated that she had made her determination after she "conducted a review of the trial record." This was consistent with the following statement that Judge Calloway included in an order outlining the scope of her duties on remand: "[T]he Court will review the entire trial record and make a determination from

---

[2] Mother's waiver of the issue notwithstanding, we stress that we do not view the mere denomination of Father as a "joint custodian" as somehow disturbing the determined rulings pertaining to Mother's control. There should be no question about Mother's authority over the major decisions in the child's life, as it is specifically delineated. In this vein, we note that trial courts are not limited by a narrow definition of joint custody and are free to outline each party's responsibilities concerning the care of the child or children at issue. *See Burlew v. Burlew*, No. 02A01-9807-CH-00186, 1999 WL 545749, at *7 (Tenn. Ct. App. July 23, 1999), rev'd in part on other grounds, *Burlew v. Burlew*, 40 S.W.3d 465 (Tenn. 2001). The term "joint custody" does not itself have an established definition. *Id.* Accordingly, even if we agreed that the characterization of the parties as "joint custodians" was outside the scope of remand, it is unclear what harm is occasioned by such a designation under the circumstances of this case. *See Swett v. Swett*, No. M1998-00961-COA-R3-CV, 2002 WL 1389614, at *7 (Tenn. Ct. App. June 27, 2002) ("[W]e have no basis to unravel the trial court's custody arrangement . . . simply because the trial court called it 'joint' custody."). Again, nothing in the trial court's order alters Mother's authority over the child's educational decisions, the child's non-emergency health care, the child's religious upbringing, and the child's extracurricular activities.

the trial record what the proper amount of parenting time the Father should have with the child."

In challenging the scope of Judge Calloway's actions on remand,[3] Mother argues that Judge Calloway impermissibly conducted a new best interest analysis and reached findings that contradicted those made previously by Judge Crawford.[4] At the outset, we reject Mother's suggestion that the trial court's fashioning of a new parenting schedule was to be divorced from a consideration of the best interest factors codified at Tennessee Code Annotated section 36-6-106(a). "The central concern in any . . . visitation ruling is the best interest of the children." *Miller v. Miller*, 336 S.W.3d 578, 583 (Tenn. Ct. App. 2010) (citation omitted). With that said, we do not dismiss Mother's concern that some of Judge Calloway's factual findings regarding the child's best interest contradicted some of the factual findings made by Judge Crawford prior to the first appeal. We say this specifically in light of the fact that Judge Calloway did not conduct a new evidentiary hearing pertaining to parenting time but limited her review to the record that had previously been established. In the first appeal, Father did not specifically challenge any of Judge Crawford's factual findings pertaining to the child's best interest. Instead, he merely contended that the amount of parenting time awarded to him was insufficient, invoking the directive from Tennessee Code Annotated section 36-6-106(a) that requires courts to order arrangements that permit both parents "the maximum participation possible in the life of the child." *See In re Grace N.*, 2015 WL 2358630, at *2 ("Father argues that the trial court erred in awarding him only 68 days of parenting time."); Tenn. Code Ann. § 36-6-106(a) ("[T]he court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child[.]"). Moreover, although we quoted extensively from Judge Crawford's order in the first appeal, including the findings pertaining to the best interest factors under Tennessee Code Annotated section 36-6-106(a), we did not take issue with any of the factual findings determined by Judge Crawford. As we perceive it, the pivotal question from our opinion was whether those findings and the established record justified the minimal number of days that had been awarded to Father. Ultimately, we concluded that Father

---

[3]Our discussion herein is limited to Mother's raised concerns about the scope of the trial court's actions on remand and the substantive rulings that were made in regard to the parenting schedule. Mother's statement of the issues section does not raise any challenge under Rule 63 of the Tennessee Rules of Civil Procedure with respect to the specific procedure followed by Judge Calloway in completing the proceedings in this case.

[4] By way of example, Mother notes that Judge Calloway made a contradictory factual finding regarding the parents' respective dispositions to provide the child with food, clothing, medical care, education, and other necessary care. Whereas Judge Crawford found that Mother showed a better disposition to provide such care, Judge Calloway found this consideration to be "equal" between Mother and Father.

was not afforded sufficient parenting time, and we remanded with instructions to increase his parenting time to at least 80 days. *In re Grace N.*, 2015 WL 2358630, at *5.

Inasmuch as (1) we did not disturb any of the factual findings pertaining to the child's best interest in the first appeal[5] and (2) Judge Calloway limited her review to the same record utilized by Judge Crawford, we agree with Mother that it was error for the trial court to make contradictory factual findings on remand.[6] In reaching our conclusion on this issue, we do not intend to suggest that the trial court was required to limit itself to the same evidentiary record regarding parenting time. We observe that our opinion did not limit the remand proceedings with respect to this point, and as a general matter, the trial court has discretion as to whether new proof should be considered in the absence of an explicit appellate directive. *See Thornton v. Massey*, No. W2013-01022-COA-R3-CV, 2014 WL 2472206, at *12 (Tenn. Ct. App. May 30, 2014) (noting that in the absence of a directive to reopen the proof or consider additional evidence on remand, the trial court's decision on whether to reopen the proof was discretionary). In this case, we are of the opinion that the trial court retained such discretion even though the factual findings regarding the child's best interest were not at issue in the first appeal. When an issue on remand involves the circumstances of children and their parents, courts may consider additional evidence in order to insure that the order is based on the parties' actual circumstances. *See Kathryne B.F. v. Michael B.*, No. W2013-01757-COA-R3-CV, 2014 WL 992110, at *7 (Tenn. Ct. App. Mar. 13, 2014) (noting that the parties' actual circumstances often change over time). Inasmuch as it was directed to fashion a new parenting schedule, the trial court possessed discretion to consider additional evidence. Had it actually exercised such discretion, there is no question that one of the factual questions pertaining to the child's best interest could have conceivably changed on remand.[7] Here, we merely hold that Judge Crawford's factual findings regarding the

---

[5] We again note that Father did not specifically challenge any of the factual findings accompanying Judge Crawford's best interest analysis in the first appeal. We reject the contention from Father's brief that, in the first appeal, this Court implicitly determined that these findings were incorrect.

[6] Father does not dispute that Judge Calloway made certain contradictory findings on remand. In his brief, he attributes this to Judge Calloway's "mastery of the facts."

[7] An illustration of the relevance new proof may have is evident from a recent divorce case emanating out of the Putnam County Circuit Court. The case resulted in two appeals to this Court. In the first appeal, we held that the evidence preponderated against restricting the mother's parenting time to 120 days a year. *Strickland v. Strickland*, No. M2012-00603-COA-R3-CV, 2012 WL 6697296, at *14 (Tenn. Ct. App. Dec. 21, 2012). We reached this decision, in part, due to the close proximity of the parents' respective homes. *Id.* Given our holding, we remanded the case for the entry of a new parenting schedule "considering that Tennessee Code Annotated § 36-6-106(a) favors a parenting schedule that gives each parent the maximum amount of time in accordance with the child's best interests." *Id.* Following the remand proceedings, the mother was ultimately awarded only 122.5 days of parenting time

child's best interest, which were unchallenged and undisturbed in the first appeal, should not have been altered on remand when the same evidentiary record formed the basis for the trial court's decision with regard to parenting time.

Notwithstanding the foregoing discussion, we are of the opinion that there is no reversible error here with respect to the parenting schedule actually implemented on remand. Having considered the properly-established facts and the overall record transmitted to us on appeal, we are satisfied that the schedule satisfies the child's best interest. As explained below, some of Mother's specific concerns are misstated, and others simply implicate minute details of the parenting schedule that do not warrant this Court's intrusion. It is well-settled that the details of a parenting schedule rest within the discretion of the trial court. *Gooding v. Gooding*, 477 S.W.3d 774, 778 (Tenn. Ct. App. 2015) (citation omitted). Moreover, it is not our role, sitting as an appellate court, to tweak a parenting schedule order in the hopes of achieving a more reasonable result. *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

On remand, Mother proposed a parenting plan that would provide her with 285 days of parenting time a year. In terms of the child's general "day-to-day" schedule, she proposed that Father would exercise responsibility for the child every other week from Friday at 4:00 p.m.[8] to Sunday at 6:00 p.m. She also proposed that Father would have parenting time with the child every Thursday from 4:00 p.m. to 6:30 p.m.

In contrast, the schedule actually implemented by the trial court provides Mother with 245 days of parenting time. Father is given 120 days, as opposed to the 80 days that Mother proposed he receive. Broadly speaking, the parameters of the child's general day-to-day schedule are somewhat similar to the schedule proposed by Mother. However, instead of having parenting time every other week from Friday afternoon until Sunday evening as Mother proposed, Father is afforded parenting time every other week from "Thursday after school to Monday at school." No doubt, this period of time is longer than the period desired by Mother, but it similarly places the majority of Father's base parenting time on the weekend, every other week. Moreover, like Mother's proposed plan, the parenting plan implemented by the trial court gives Father parenting

---

a year. *Strickland v. Strickland*, No. M2013-02657-COA-R3-CV, 2014 WL 4440667, at *2 (Tenn. Ct. App. Sept. 9, 2014). Although the mother argued on a second appeal that the trial court had failed to give her meaningful parenting time as directed, *id.* at *1, we affirmed and quoted from the trial court's findings indicating that the parents now lived "an appreciable distance [a]part." *Id.* at *3-4.

[8] This specific term was part of the proposed plan Mother submitted in connection with a motion to alter or amend. In another proposed plan, which was submitted in connection with "Mother's Response to Father's Motion to Enforce Mandate of the Court of Appeals," Mother requested that Father's parenting time on Fridays begin at 3:00 p.m.

time on at least one day every week. However, instead of having parenting time every Thursday from 4:00 p.m. to 6:30 p.m. as proposed by Mother, Father has parenting time with the child every Wednesday after school until 7:00 p.m.

Having reviewed the basic terms of the child's general day-to-day schedule, it is clear that the trial court did not order a "week on/week off parenting arrangement" as Mother states in her brief. Moreover, while Mother remarks that "every other week . . . Tuesday is the only day that Father does not hav[e] parenting time with the child," the phrasing of this statement is somewhat disingenuous. For example, although Father has parenting time every Wednesday afternoon, the child is Mother's responsibility following 7 p.m. on Wednesdays. Moreover, although it is technically true that Father has parenting time on every other Monday, he does not have responsibility for the child once the child is at school. Under the provisions of the child's day-to-day schedule, the child's Monday afternoons and evenings are spent with Mother. When divorced from this context, Mother's sweeping statements about the parenting schedule are clearly exaggerated.

In her brief, Mother raises a number of concerns about Father's work schedule and how it may impact his ability to exercise parenting time with the child. In many places, we observe that her argument is largely reliant on evidence that was not part of the record Judge Calloway reviewed incident to the parenting time decision. For example, Mother references some of Father's discovery responses from September 2015 to highlight certain work conflicts that he has. These discovery responses, along with other evidence that was not part of the record Judge Calloway reviewed,[9] were also referenced by Mother in support of a motion to alter or amend the trial court's decision as to parenting time. Although Mother discusses the denial of her motion to alter or amend in her appellate brief, she does not formally raise an issue concerning the trial court's denial of that motion or the trial court's refusal to consider the additional evidence she attempted to marshal for its review. In any event, we note that much of this additional evidence was available to Mother well before the trial court made any decisions with respect to parenting time on remand. Aside from the September 2015 discovery responses, Mother's brief references (as did her motion to alter or amend) a subpoena response from October 2015. Although Mother now appears to assert that the trial court should have taken this evidence into account when fashioning the parenting schedule, we observe that she specifically stated as follows in support of a December 2015 motion seeking to specify the scope of the remand hearing: "Consideration of new evidence and a hearing are unnecessary [with regard to parenting time]."

_____
[9] The discovery responses were later presented as proof in the child support hearing.

- 13 -

Although some of the additional evidence that Mother refers to was unavailable at the time the trial court entered its parenting time order, specifically an aftercare enrollment contract dated January 25, 2016, we do not think this evidence elicits the concern that Mother seems to attach to it. Thus, even if Mother had properly raised the denial of her motion to alter or amend as an issue on appeal and we agreed that the aftercare enrollment contract should have been considered by the trial court, we find no occasion to disturb the adopted parenting schedule. Mother cites to the aftercare contract in an attempt to show that Father will be unable to exercise the parenting time that the trial court awarded him. Specifically, she notes that Father enrolled the child in an aftercare program following dismissal from school every Wednesday, as well as every other Thursday and Friday. The aftercare contract provides that the child's enrollment on these days is from "dismissal to 6 p.m." According to Mother, this is evidence that the trial court's adopted schedule in effect gives Father parenting time that he is not able to exercise.

We do not share Mother's concern for a number of reasons. First, it does not appear that the child will actually stay at aftercare until 6 p.m. on every day that Father exercises parenting time. In fact, in citing Father's September 2015 discovery responses, Mother notes that Father works until 4:00 p.m.[10] Moreover, we observe that her proposed parenting plan actually provided that Father's parenting time would begin on Friday (a work day) at 4:00 p.m. Inasmuch as Mother represents that the child's school dismissal is now at 2:50 p.m., it does not appear that the child would actually be at aftercare for an undue length of time. Moreover, the mere fact that the child would be enrolled in an aftercare program for some amount of time does not warrant a restructuring of the parenting schedule. In fact, we can see some advantages to allowing the child to stay in an aftercare program for a short period of time on days when Father has parenting time. Namely, it reduces the number of required exchanges between the parties, which was a specific concern of Mother's in her appellate brief.

Mother also takes issue with a number of minor details of the parenting schedule, including a provision regarding the child's birthday that provides as follows: "[W]hichever parent does not have scheduled parenting time on the child's birthday may elect a two hour period to spend with the child. The parent exercising that time shall notify the other parent in writing 30 days prior and shall be responsible for transportation." We fail to see any basis upon which to disturb the trial court's decision to include this provision. To the extent Mother is arguing that her proposed parenting schedule better addresses minor logistical details such as the child's birthday, her argument is without merit. As we stated previously, it is not our role as an appellate

---

[10] Mother also cites proof in the record indicating that Father works until 4:30 p.m.

court to tweak a parenting schedule in the hopes of achieving a more reasonable result. *Id.*

Again, having reviewed the record, we are satisfied that the entered parenting schedule satisfies the child's best interest. In the first appeal, we concluded that the amount of days awarded to Father was insufficient and remanded the case with instructions "to increase Father's parenting time to *at least* the minimum 80 days presumed by the Guidelines." *In re Grace N.*, 2015 WL 2358630, at *5. The order entered on remand complied with this directive and ensures that the Father has more meaningful time in the child's life. We therefore turn our attention to the remaining issues on appeal.

### *Fatherland Property and Barter Income*

Outside of the parties' respective requests for attorney's fees, the remaining issues on appeal relate to the trial court's August 8, 2016 order on child support. To begin our review of the child support order, we first review the trial court's findings pertaining to the Fatherland Property and Father's barter income. In the first appeal, we held that Father's income had been erroneously determined on account of both of these topics. Specifically, we concluded as follows: "[W]ith respect to Father's income, we have determined that the trial court erred in attributing the value of all of the legal services to Father (based on the bartered in-kind services) and in presuming that Father owned 50% of the Fatherland property. We, therefore, remand the issue of Father's income to the trial court for reconsideration." *Id.* at *10.

Thus, on remand, the trial court was directed to determine the amount of income Father had earned from the Fatherland Property, as well as the income he had earned from bartering with his attorney. The trial court complied with this mandate, but Mother presently challenges its determinations with respect to both sources of income. We address each of the trial court's findings in turn.

As stated above, when we remanded for a reconsideration of Father's income pertaining to the Fatherland Property, we did so based on our determination that the trial court had erred in presuming that he owned 50% of that property. Specifically, we held that the trial court erred in concluding that Father had failed to overcome the statutory presumption of 50/50 ownership established by Tennessee Code Annotated section 36-5-903. *Id.* Following an evidentiary hearing on remand to determine what income Father had actually received from the Fatherland Property, the trial court made the following findings:

- 15 -

> Eric Rajotte and the Father both testified that the Father received $2,700.00 in 2014 from the sale of the Fatherland Street property. . . . All documentation supports the fact that Father received $2,700.00 at closing. The Court finds no evidence to support [a finding that] Father realized any rental income from the Fatherland Street property. Further, testimony and evidence supported the [fact that] Father did not participate in the day-to-day management of the property and none of the rental income or payment of expenses passed through his hands. Therefore, the Court imputes $2,700.00 of income to Father in 2014 as profit received from this endeavor.

We affirm the trial court's determination of income with respect to this issue. As is clear from the trial court's findings, the evidence considered on remand established that the only income Father received from the Fatherland Property was the $2,700.00 he received upon its sale. Although a deed to the property reflected that it had been jointly owned by Father, Eric Rajotte, and Richard Rajotte, *see id.*, Father testified on remand that his interest in the property was limited to a portion of the profit that Eric Rajotte received upon the sale of the property. This was consistent with the testimony of Eric Rajotte, who explained their relationship as follows: "I had asked [Father] to let me do the loan in his name, because I had too many properties in my name, and that I would give him a percentage of my profit on the completion of the deal."

Just as the evidence supports the trial court's determination of Father's income relative to the Fatherland Property, the evidence supports the trial court's determination of Father's income from bartering with his attorney. When we reversed the trial court in the first appeal with respect to its determination of Father's barter income, we did so by holding that there was no proof indicating that Father's services for his attorney were sufficient to cover his entire bill for attorney's fees. *Id.* Noting that the determination of Father's barter income required placing a value on his services, we observed that Father and his attorney had not valued them, nor had the trial court. *Id.*

On remand, however, evidence was presented concerning the extent of Father's services and the value associated with them. The trial court referenced this evidence in determining that $2,925.00 was a reasonable value for the bartering services Father had provided, ruling as follows:

> Father and his attorney testified that Father performed several maintenance and repair jobs at his attorney's rental home and personal residence ranging from making repairs to a screened in porch, repairing a board over a carport, assembling a kitchen island, repairing damage caused by a dog to some doors and other miscellaneous repairs. Testimony by both parties

- 16 -

indicates Father was credited $2,925.00 for his work. This was further evidenced by the 2014 1099-MISC provided to Father by his attorney and the invoice from his attorney in June of 2014 which shows credit for the same amount in May of 2014. The parties testified there was no specific agreement as to the amount per hour or amount per project. Rather, the parties discussed the work completed after the fact and, considering the time and effort involved, agreed to $2,925.00 as being fair. The parties also testified that the amount was probably lower than what a contractor would have charged because Father is not a licensed contractor, could not work on the project on a full-time or even on a regular basis and that Mr. Spark did a lot of the work himself or with Father. Mother's counsel cross examined both witnesses regarding the number of hours worked in total. Neither witness could give a clear answer; however, Mr. Spark noted that, when suggested to him by Mother's counsel, 100 hours sounded about right, which would equate to $29.25 per hour.[11] The Court finds $2,925.00 reasonable for the bartered services.

Because the evidence supports the trial court's findings, we will not disturb the trial court's determination with respect to this issue.[12]

### *"Base Income" amounts from 2010-2013*

Although we affirm the trial court's rulings concerning the Fatherland Property and Father's barter income, we agree with Mother that other income amounts attributed to Father prior to the first appeal were erroneously excluded on remand. We reach this conclusion in light of the trial court's actions prior to the first appeal and the scope of our appellate review with respect to those actions. When Father's income was determined prior to the first appeal, the trial court attributed income to Father based on the following: (1) Father's representation of his income in various documents, (2) Father's ability to live rent-free in his mother's condominium, (3) income from the Fatherland Property, and (4)

---

[11] We note that Father also testified that "[i]t's possible" that he worked up to 100 hours on the various projects. He could not give a specific estimate as to the number of hours he worked. In fact, when asked by Mother's counsel if he could say that he worked "50 or 150 hours," Father indicated that he could not.

[12] We also reject Mother's specific assertion that the trial court erred in failing to impute income to Father based on certain bartering transactions with his sister and transcriptionist. In support of her assertions of error on this issue, Mother cites to proof considered at the original trial prior to the first appeal. Because nothing from our opinion in the first appeal suggests that we predicated any error on the trial court's failure to assign income on account of these other transactions, we fail to see how the trial court committed any error on remand in failing to address them.

Father's bartered services with his attorney. The trial court's specific calculation of Father's income from 2010-2013 was as follows:

- For the year 2010: The Court attributes income to the Father in the amount of $43,200 (as he represented on his credit application) plus $650 per month beginning in June 2010 (6 months) ($3,900.00) for the gift from his mother of living rent-free in her condominium for a total of ($47,100.00) for 2010 or $3,925.00 average per month

- For the year 2011: The Court attributes income to the Father in the amount of $40,000 (as he represented on his application to finance the purchase of the Fatherland Street property) plus $650 per month for 12 months for the gift from his mother of living rent-free in her condominium, i.e., $7,800.00 for a total of $47,800.00 for 2011 or $3,983.34 per month

- For the year 2012: The Court attributes income to the Father in the amount of $51,600 (as he represented on the Affidavit of Income And Property in support of his Motion For Installment Payments And To Return Any Monies Held By Clerk filed on May 17, 2013) plus rental income from the duplex for 10 months (beginning in February, 2012 when the Fatherland Street property was purchased) in the amount of $390.64 per month for one-half (1/2) of the rental income from the Fatherland Street property ($781.28 -- calculated as the difference between the monthly rental income of $1,500 and the monthly mortgage payment of $718.72) plus $650 per month for 12 months for the gift from his mother of living rent-free in her condominium for a total of $63,306.40 for 2012 or $5,275.53 average per month

- For the year 2013: The Court attributes income to the Father in the amount of $45,333.36 (as per his W-2 for 2013) plus his half of Fatherland Street rental income for 12 months in the amount of $390.64 per month ($781.28 -- calculated as the difference between the monthly rental income of $1,500 and the monthly mortgage payment of $718.72 which equals $4,687.68 for the year) and $650 per month for 11 months for the gift from his mother of living rent-free in her condominium until his marriage late in November, 2013 when he moved for a total of $7,150.00 plus $20,327.50 in bartered services as attested to by Mr. Spark for a total 2013 income of $77,498.54 (or $6,458.22 per month)

- 18 -

As is clear, the trial court in effect determined a "base income" from Father's representations on various documents, added income to account for Father's living rent-free in his mother's condominium, and when relevant, attributed further income based on the Fatherland Property and Father's bartering.

In the first appeal, Father conceded that the trial court properly attributed income to him for the free use of his mother's condominium. *Id.* at *7. He did, however, raise several grievances pertaining to the determination of his income. In addition to challenging the specific amount that should be attributed to him as a result of living in the condominium, *id.*, Father took issue with the trial court's findings regarding the Fatherland Property and his bartering with his attorney. When reviewing these matters, we affirmed the trial court's decision as it pertained to Father's usage of his mother's condominium. *Id.* at *10. However, as previously discussed herein, we reversed the trial court with respect to the other two issues and accordingly remanded Father's income for reconsideration. *Id.* Although Father appears to argue that our remand permitted the trial court to reconsider every source of Father's income, save for the issue connected to him living in his mother's condominium, we find no merit in his position. It is clear from the context of our opinion that we remanded the issue of Father's income solely to account for the errors committed with respect to the Fatherland Property and Father's barter income. No error was found with respect to any other finding pertaining to Father's income, including the trial court's decision to attribute the "base income" amounts that Father had represented on various documents. We only took issue with the trial court's finding regarding the Fatherland Property and its decision to attribute over $20,000.00 in barter income. This is plainly evident in our conclusion on the topic, wherein we stated as follows: "Thus, with respect to Father's income, we have determined that the trial court erred in attributing the value of all of the legal services to Father (based on the bartered in-kind services) and in presuming that Father owned 50% of the Fatherland property. We, therefore, remand the issue of Father's income to the trial court for reconsideration." *Id.*

Given the foregoing, we agree with Mother that the calculations made on remand are incorrect as they pertain to Father's income in 2010-2013. Although the trial court was permitted to alter the total income attributable to Father during those years, its ability to do so was dependent on new findings regarding Father's barter income and his income from the Fatherland Property. As we have discussed, those are the only matters that we took issue with concerning Father's income in those years. We accordingly reverse the trial court to the extent that its recalculation of Father's income in 2010-2013 was based on anything other than a reconsideration of the two issues with which we took issue in the first appeal. The trial court's error on this point, and other errors which we will discuss below, justify a second remand of the case for the proper determination of child support.

The prior findings regarding Father's "base income"[13] from 2010-2013 should be taken into account when Father's child support obligations are recalculated.

### Musician Profit Income and Cell Phone Fringe Benefit

We next address Mother's concern that the trial court committed error by failing to include certain sources of income when it calculated Father's prospective support obligation. Specifically, she asserts that the trial court erred in failing to include the musician profit income Father reported on his 2015 Schedule C. Moreover, she asserts that the trial court erred when it excluded Father's employer-provided cell phone fringe benefit from his income.

The trial court excluded the cell phone benefit by concluding that, based on an IRS Internal Revenue Bulletin, the cell phone benefit was "*de minimis*" and to be ignored when calculating gross income. Father appears to agree that the trial court was entitled to rely on this authority, and he notes that when both the cell phone benefit and musician profit income are considered, these items amount to only $139.00 per month. Although Father may argue that this is an amount "hardly worth consideration," we agree with Mother that if it is income under the Guidelines, it should not be ignored. Under the Guidelines, gross income includes "*all* income from any source." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a) (emphasis added). Moreover, with respect to the cell phone benefit specifically, the Internal Revenue Bulletin relied on by the trial court pertains to the calculation of a citizen's gross income under the Internal Revenue Code. This case does not involve a federal tax obligation, but rather, it involves the calculation of child support under state law. With that in mind, we note that the Guidelines specifically provide that "[f]ringe benefits . . . shall be counted as income if they reduce personal living expenses." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(4). Although we can certainly understand Father's sentiment that the amounts at issue are arguably somewhat minimal, we fail to see how that is a basis to ignore amounts that clearly constitute income under the Guidelines. Therefore, on remand, these additional amounts should be considered when support is recalculated.

### Mother's Underemployment

In the first appeal, Father challenged the calculation of his child support obligation by, among other things, arguing that Mother had been underemployed *in 2013*. *See In re Grace N.*, 2015 WL 2358630, at *5 ("Father argues that . . . Mother was underemployed

---

[13] When we refer to the "base income" amounts, we refer to those amounts that were originally attributed to Father by Judge Crawford based on Father's representations of his income in various documents.

in 2013[.]").  In highlighting this argument and Mother's response thereto, we stated as follows:

> Father argues that Mother worked only part time in 2013 and "spent much of her time acting as a contractor on her and her husband's new home." Father asserts that Mother had two housekeepers, applied for private school for the child but did not apply for financial aid, was a licensed attorney, and now took the position that "she's unable to market her practice because she has no time and did her marketing in the past in the evenings prior to the Child's birth."  Prior to the child's birth, Mother was making $90,000 a year or more; in 2013, she made $19,000.  Father argues that he should not have to subsidize Mother's decision to act as a contractor on her new home and "should not have to suffer the consequences if Mother's law practice is no longer viable."  Mother counters that she assumed all parenting responsibilities until the child was over two-and-a-half years old while trying to work from home.  She attributed the loss of a substantial portion of her income to her inability to hire other employees and to her main client leaving to go to a competitor in a buy out.

*Id.* at *6.  After providing this overview of the parties' respective positions, we observed that the trial court had failed to consider Father's argument with respect to underemployment.  *Id.*  We noted, however, that the trial court would have another opportunity to consider the underemployment issue when it increased Father's parenting time on remand and recalculated support.  *Id.*

On remand, the trial court considered the issue of Mother's underemployment, but in doing so, it specifically inquired as to whether Mother had been underemployed since the date of the child's birth.  After addressing this question, the trial court held that "Mother is clearly underemployed and has been so since June of 2010."  In connection with this finding, the trial court specifically stated as follows:

> There is no question Mother has made a conscious decision to forgo work and reduce her income given her education, experience and abilities. Mother admitted such via email to Father, stating she sacrificed her practice to spend time with the Child.  Furthermore, testimony and evidence supports this as well, meeting the burden of proof necessary to establish Mother is voluntarily underemployed.

Concerning the amount it would impute as income to Mother, the trial court found that "Mother had the capacity to earn at least $70,000.00 per year for 2010[.]"  Moreover, it

held that "Mother had and has the capacity to earn $80,000.00[] or more per year as of January of 2012 and thereafter, which is less than she earned before the Child's birth."

Although Mother argues that the evidence does not support a finding that she was voluntarily underemployed from the summer of 2010 onward, she also argues that the trial court was without authority to make such a determination for years prior to 2013. We are in agreement with Mother with respect to this latter point. As our prior opinion reveals, Father's argument in the first appeal concerning Mother's underemployment did not concern any years prior to 2013. *See id.* at *5-6. Therefore, although we remanded the case for a consideration of the underemployment issue, we fail to see how our remand allowed the trial court to address underemployment issues prior to 2013. Given his specific challenge in the first appeal, Father waived any issue he may have had with respect to Mother's alleged underemployment in years prior to 2013. Because the trial court had no authority to consider the underemployment issue with respect to years prior to 2013, we reverse its decision to impute income to Mother in those prior years. Our conclusion on this issue should be taken into account when child support is again recalculated on remand.

This error notwithstanding, we take no issue with the remainder of the income that was imputed to Mother. "Whether a party is willfully and voluntarily underemployed is a fact question, and the trial court has considerable discretion in its determination." *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001) (citation omitted). A trial court must consider a party's past and present employment, as well as whether the party's choice to accept a lower paying job was reasonable and in good faith. *Id.* (citation omitted). Although a person has a right to pursue happiness and make reasonable employment choices, courts are inclined to find willful and voluntary underemployment when a party voluntarily leaves his or her employment and chooses to accept a job which provides significantly less income. *Id.* (citations omitted).

In this case, Mother is a licensed attorney. She was previously self-employed and operated her own law firm. In 2013, however, she left her own practice and became a non-equity member with the Farris Bobango firm. At Farris Bobango, Mother works as an independent contractor and is paid a percentage of collections, which is dependent on whether or not Mother originated the work. The evidence shows that in the year before the child's birth, Mother earned nearly $90,000.00 as a lawyer. In the subsequent years, however, Mother's income from the practice of law was substantially lower. In 2013, for instance, Mother earned approximately $20,000.00 from the practice of law. In 2014, she earned well-under $20,000.00 from the practice of law. Although Mother earned more in 2015 from the practice of law, her legal practice income that year was still less than $30,000.00.

Mother attributes much of her drop in income in 2013 to the loss of a significant client. The trial court did not ignore this fact, however, and specifically acknowledged that "the loss of a major client would adversely impact [Mother's] practice." Nonetheless, the trial court still concluded that, based on the evidence presented, Mother had made a conscious decision to forgo work. In challenging the trial court's underemployment determination, Mother argues that the trial court abused its discretion in failing to consider the value of her role as a stay-at-home parent. She also argues that her reasons for working less are reasonable and serve the child's best interests. In doing so, she touts the merits of her "flexible schedule and ability to work from home." While we do not disagree with Mother that her responsibilities for the child are relevant, we fail to see how the trial court committed reversible error as to this issue. Although the trial court determined that Mother was willfully underemployed, in part, due to the significant drop in her practice income following the child's birth, the trial court actually imputed income to Mother at a lower amount than she had earned before the child was born. From our reading of the trial court's order, it is clear that the trial court considered Mother's responsibilities in reaching this result. In fact, we observe that immediately after stating the amount of income that it was imputing to Mother, the trial court stated as follows: "The Court finds this reasonable *given her role as the primary parent* and the challenges of self-employment." (emphasis added)

In addition to challenging the trial court's determination that she was voluntarily underemployed from July 2010 onward, the statement of the issues section of Mother's brief specifically challenges the trial court's imputation of income "based upon an 'earning capacity' that the judge determined by independent research conducted outside of the remand proceedings." With respect to this latter matter, Mother contends that the trial court's finding is based on a website maintained by the Bureau of Labor Statistics.

There is no question that the trial court's order references the website about which Mother complains. Following its finding that Mother had the ability to earn $80,000.00 per year as of January 2012, the trial court dropped a footnote that stated as follows: "The figures are far below the mean or median annual wage for lawyers in Middle Tennessee cited by the Bureau of Labor Statistics for each year. http://www.bls.gov/oes/tables.htm." Notwithstanding this reference, we do not interpret the trial court's imputation of income to actually be based upon it. That is, even assuming the trial court's *sua sponte* reference to the website was unjustified, we interpret the reference as an editorial attempt to illustrate the sensibility of a decision already-made, as opposed to an attempt to marshal an evidentiary foundation for a ruling. From our reading of the trial court's order, the trial court's imputation of income was clearly predicated upon the income Mother had earned before the child's birth. In fact, immediately following its imputation of income to her, the trial court stated that it had imputed income at an amount which was "less than she earned before the Child's birth."

- 23 -

In summary, although we agree with Mother that the trial court erred in imputing income to her in years prior to 2013, we otherwise affirm the trial court's decision as it relates to the issue of Mother's underemployment.

***Childcare Expenses***

In the first appeal, we concluded that the trial court had abused its discretion in its consideration of Mother's claimed work-related childcare expenses. *In re Grace N.*, 2015 WL 2358630, at \*7. Among other things, we observed that certain comments by the trial judge suggested that her personal views had influenced the trial court's decision. *Id.* In light of our determination that error had been committed, we remanded the case for a new hearing on the issue. *Id.* The matter was ultimately addressed in the trial court's August 8, 2016 order following a hearing.

In its August 8 order, the trial court determined that Mother's childcare costs should be reduced to $550.00 per month. In connection with this ruling, the trial court held that "Father should not have to underwrite Mother's use of child care for anything other than employment." In addition to reducing the amount of childcare costs it would consider for certain periods, the trial court ruled that no work-related childcare expenses should be considered past August 2015, the date that the child entered kindergarten. Further, one of the trial court's child support worksheets reflected that no childcare expenses were taken into account with respect to the first six months of the child's life.

In her brief, Mother begins her discussion on this issue by arguing that Father previously challenged Mother's childcare expenses solely on cost and only with respect to a two-year period between May 2010 and May 2012. By doing so, she appears to suggest that the trial court was not permitted to reduce any of her claimed expenses with respect to any other period or on account of any other basis. We must reject Mother's suggestion in light of the discussion from our opinion in the first appeal. For example, as Father observes, our opinion discussed Father's argument as embracing not only whether Mother's expenses were excessive, but also whether Mother's expenses were foundationally proper, i.e., work-related. Moreover, it is clear that we did not view the issue to only be relevant to the two-year period referenced by Mother. In the course of discussing Father's argument, we stated as follows: "In 2013, Mother claimed the full credit for daycare despite the fact that she was working as a contractor on her new home." *Id.* at \*6. Our opinion further stated that we were remanding for a "*new hearing* on work-related child care expenses," *see id.* at \*7 (emphasis added), and as such, our opinion clearly did not impose the boundaries for which Mother presently advocates. With the foregoing in mind, we turn to the substantive issues regarding the trial court's reduction/elimination of certain childcare costs.

- 24 -

In Mother's statement of the issues section, she challenges three discrete determinations with respect to her childcare expenses. First, she asserts that the trial court erred in reducing her childcare costs from July 2010 through July 2015. Second, she asserts that the trial court erred in eliminating her childcare costs for the first six months of 2010. Third, she asserts that the trial court erred in eliminating her childcare costs from August 2015 and thereafter. We begin our analysis by addressing the second of these three issues. Although Mother's statement of the issues section predicates error on the trial court's exclusion of childcare costs pertaining to the first six months of 2010, there is no substantive argument in Mother's brief as to this matter.[14] In fact, her principal brief does not appear to contain any explanation as to why her claimed childcare costs during the first six months of the child's life should have been taken into account. When a party raises an issue in its brief but fails to address it with argument, the issue is considered waived. *Childress v. Union Realty Co., Ltd.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002). Moreover, we observe that Mother does not actually request any relief with respect to the beginning of the child's life. In the conclusion section of her principal brief, Mother's prayer asks that we reverse (a) the trial court's reduction of costs and (b) its elimination of costs *beginning in August 2015*. Notably, no request is made to reverse and vacate the elimination of costs in the initial months of the child's life.

We next address the trial court's reduction of Mother's claimed childcare costs to $550.00 per month. Although Mother certainly presented proof that she spent greater amounts on childcare, the trial court gave Mother less credit due to a couple of reasons. In addition to expressing concern over the costs associated with the nannies that Mother had employed before the child went to daycare, the trial court expressed concern that Mother's childcare costs were not necessarily work-related. With respect to this latter point, the trial court specifically held that "Father should not have to underwrite Mother's use of child care for anything other than employment."

Having reviewed the record transmitted to us on appeal, we cannot say that the trial court erred in determining that Mother was only entitled to a credit for $550.00 per month. This remains especially so in light of the trial court's concern that not all of the claimed childcare expenses were used to enable Mother's employment. Under the section of the Guidelines at issue, childcare expenses "shall be averaged for a monthly amount and entered on the Worksheet in the column of the parent initially paying the expense" when those expenses are "necessary for either parent's employment, education, or vocational training," "are determined . . . to be appropriate," and "are appropriate to

---

[14] Ostensibly, Mother's concern about the authority of the trial court on remand implies a concern that the trial court was without authority to eliminate any claimed costs during the initial months of the child's life. However, such an argument does not appear to be specifically advanced, and in any event, we have rejected Mother's concern about the scope of remand on this issue.

the parents' financial abilities and to the lifestyle of the child if the parents and child were living together." Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(c). As is evident, the expenses must be "necessary" for employment, education, or training, and here, the trial court had obvious concern that not all of the expenses satisfied this standard.

The trial court's concern is supported by the record. Although Mother claimed that she had worked up to 70 or 80 hours a week before the child was born,[15] there is no dispute that she did not keep such a schedule following the child's birth. However, there is a lack of clarity as to exactly what hours she worked, and the record raises a genuine question as to whether Mother was actually working during the entirety of the time she had the child receive childcare services. With respect to the period she employed a nanny, Mother stated that she could not recall whether she was working the entire time the nanny was being utilized. When questioned further about this matter, specifically whether she recalled going out with friends, Mother stated she was "sure" that she did. Mother interjected, however, that this would have been a way to network.

As a general matter, Mother's testimony revealed that her work hours varied substantially following the child's birth. In discussing this point in her reply brief, she notes that her hours have ranged anywhere from 20 hours a week to 40 hours a week. When testifying about certain periods of time, however, Mother could not do anything other than guess as to the amount of hours she worked. For example, concerning the second six months of the child's life, during which a nanny was employed, Mother could only speculate. As evidenced by the following exchange, although Mother guessed that she may have worked anywhere between 30 and 40 hours a week, she ultimately stated that she did not know:

> Q. Okay. Let's get into specifics. How many hours a week do you think you were working in the first six months after Grace was born?
>
> A. I don't know, because breast feeding definitely interrupted that substantially.
>
> Q. Okay. What about in the second six months?
>
> A. I was still breast feeding, so the same -- I think the same issue would apply.

---

[15] Incidentally, there was testimony stating that Mother had never worked such hours in the period before the child's birth. One of Mother's former employees testified that Mother had never worked an 80-hour week. The former employee testified that Mother had "probably worked four or five" hours a day. Father testified that in the period he lived with Mother, she never worked a full 40-hour week.

Q. Okay. So you don't know how many hours a week you were working?

A. Not off the top of my head, no. I mean, I guess anywhere between 30 and 40 hours a week. I don't know.

Moreover, the evidence reveals that in certain periods when Mother's working hours dropped significantly per her own testimony, such as in 2013, the child was still enrolled in childcare full-time.

We agree with the trial court's determination that Mother should not get credit for childcare expenses that are not work-related. There was evidence suggesting that Mother was not attending to work-related matters during the entirety of the child's time in childcare, and the trial court effectively found this to be the case. It is apparent from its ruling that it determined that Mother did not work a full work week on average, and as such, we find no occasion to disturb its determination that she is entitled to a credit for only $550.00 a month, which corresponds to the amount Mother had previously paid to send the child to a daycare three days per week.

Despite this conclusion, we agree with Mother that the trial court erred in holding that she was not entitled to any credit for childcare expenses following August 2015. The trial court reached this conclusion simply due to the fact that the child had entered kindergarten. Indeed, in its August 8, 2016 order, the trial court stated as follows: "The Child entered kindergarten in August of 2015 negating the need for childcare. As such, no work related childcare expenses will be considered for child support calculations after school began in August 2015."

Mother argues that this ruling fails to account for her need for childcare during the summer. In her principal appellate brief, for example, she states as follows: "It is unclear how Father and [the trial judge] expect Mother to work in the summers without childcare." We agree with Mother's argument. The trial court's stated reason for denying Mother any credit following the child's entry into kindergarten is simply wrong. While the trial court treats the entry into formal schooling as "negating the need for childcare," this statement paints with too broad a brush. Mother will still need childcare during the summer when the child is out of school. The evidence preponderates against a finding holding otherwise.

Contrary to Father's argument in his brief, Mother offered proof of what her summer childcare expenses would be. In fact, in the hearing on remand, Mother submitted evidence that she had already paid towards the child's summer care. Based on her hearing testimony, the child's summer care program cost approximately $137.00 per month, when annualized over a 12-month period. Mother should have received a credit

for these expenses. When child support is recalculated on remand, Mother should be given a credit for these summer childcare expenses.

### Health Insurance and Out-of-Pocket Medical Expenses

On remand, the trial court held that Father, not Mother, would provide health insurance for the child. It also determined that all non-insured out-of-pocket medical expenses were to be shared as follows: Mother (63%) and Father (37%). Mother argues that the trial court was without the authority on remand to make these decisions. We agree. When we remanded the case following the first appeal, we did not direct the trial court to consider these issues. In fact, in the first appeal, we specifically found "no error in the trial court's decision to order Mother to provide health insurance for the child." *In re Grace N.*, 2015 WL 2358630, at *11. Further, our prior opinion took no issue with respect to the previous 50-50 allocation of uncovered medical expenses. In light of the fact that we did not disturb the trial court's decision with respect to these issues in the first appeal, they should not have been altered on remand. We therefore vacate the designations made with respect to these matters and direct that the previous determinations be reinstated incident to the recalculation of child support.

### Attorney's Fees

In closing, we note that both parties' briefs contain a request for appellate attorney's fees. The decision to award attorney's fees incurred on appeal is within the discretion of this Court. *Yattoni-Prestwood v. Prestwood*, 397 S.W.3d 583, 597 (Tenn. Ct. App. 2012) (citations omitted). In this case, in view of the fact that both parties have been successful on some issues, we decline to award attorney's fees to either party.

### Conclusion

Although we affirm the parenting schedule entered by the trial court, we reverse the trial court's calculation of child support and remand for recalculation in light of the errors that we have identified herein. Finally, we vacate the trial court's ruling designating the father as the provider of health insurance for the child and designate that the previous determinations be reinstated incident to the recalculation of child support. Costs on appeal are assessed equally between the parties: one-half to Rachel N., and her surety, and one-half to Julian G. We hereby remand this case for the collection of costs, enforcement of the judgment, and for such further proceedings as are necessary and consistent with this Opinion.

_____

ARNOLD B. GOLDIN, JUDGE

- 28 -